# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TODD RAMSEY, FREDERICK BUTLER, MARTA NELSON, DIANE LEWIS, SIMONE ADAMS, KASANDRA ADAMS, AND BRIAN ADAMS, individually and as representatives of a class of similarly situated persons of, and on behalf of, the Philips North America 401(k) Plan, | CIVIL ACTION NO. 3:18-cv-1099 |
| *Plaintiffs*, | COMPLAINT—CLASS ACTION |
| v. | DEMAND FOR JURY TRIAL |
| PHILIPS NORTH AMERICA LLC, | |
| *Defendant*. | |

## COMPLAINT

1.    Plaintiffs Todd Ramsey, Frederick Butler, Marta Nelson, Diane Lewis, Simone Adams, Kasandra Adams, and Brian Adams, individually and as representatives of a class of participants and beneficiaries in the Philips North America 401(k) Plan ("Plan"), bring this action under 29 U.S.C. §§1132(a)(2) and (3) on behalf of the Plan against Defendant Philips North America LLC (f/k/a Philips Electronics North America Corporation) for breach of fiduciary duties.

2.    Today, 401(k) defined contribution plans, in which the employee's retirement assets are at risk of high fees and underperformance, have become America's primary retirement system, departing from traditional defined benefit

(pension) plans where the employer assumes the risk.[1] With over $3 billion in assets, the Plan is in the top *0.08%*—less than 1%—of over 620,000 401(k) plans offered to participants based on plan assets.[2] The marketplace for 401(k) retirement plan services is established and competitive. Multi-billion dollar defined contribution plans, like the Plan, have tremendous bargaining power to demand low-cost administrative and investment management services. As fiduciary to the Plan, Defendant is obligated to act for the exclusive benefit of participants and beneficiaries and ensuring that plan expenses are reasonable. These duties are the "highest known to the law" and must be performed with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). Instead of using the Plan's bargaining power to benefit participants and beneficiaries, Defendant selected and retained high-cost and poor-performing investments compared to available alternatives and caused the Plan, and hence participants, to pay unreasonable expenses for administration of the Plan.

    3.    To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries in the Plan, bring this action on behalf of the Plan under 29 U.S.C. §§1132(a)(2) and (3) to enforce Defendant's personal liability under 29 U.S.C. §1109(a) to make good to the Plan all

---

[1] Nancy Trejos, *Retirement Wreck,* WASHINGTON POST (Oct. 12, 2008), available at http://www.washingtonpost.com/wp-dyn/content/article/2008/10/11/AR2008101100177.html.

[2] *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans* at 11 (Dec. 2014), available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf.

losses resulting from each breach of fiduciary duty and restore to the Plan any profits made through Defendant's use of the Plan's assets. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of ERISA's fiduciary duties and other such equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

4.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3), for which federal district courts have exclusive jurisdiction under 29 U.S.C. §1132(e)(1).

5.      This district is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject Plan is administered, where at least one of the alleged breaches took place, and where the defendant may be found. Defendant is subject to nationwide service of process under 29 U.S.C. §1132(e)(2).

## PARTIES

### Philips North America 401(k) Plan

6.      The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

7.      The Plan was established by Philips North America LLC (f/k/a Philips Electronics North America Corporation) ("Defendant" or "Philips") and is maintained under a written document in accordance with 29 U.S.C. §1102(a).

8.     The Plan provides for retirement income for Philips employees. That retirement income depends on contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and on the performance of investment options net of fees and expenses exclusively controlled by the fiduciaries of the Plan.

9.     Philips established a trust to hold participant and employer contributions and such other earnings, income and appreciation from Plan investments less payments made by the Plan's trustee to carry out the purposes of the trust and Plan in accordance with 29 U.S.C. §1103(a).

10.     As of December 31, 2014, the Plan had over $3 billion in total assets and approximately 30,000 participants with account balances.

## Plaintiffs

11.     Todd Ramsey is a participant in the Plan under 29 U.S.C. §1002(7) because he is or may become eligible to receive a benefit under the Plan, or his beneficiaries may be eligible to receive any such benefit.

12.     Frederick Butler is a participant in the Plan under 29 U.S.C. §1002(7) because he is or may become eligible to receive a benefit under the Plan, or his beneficiaries may be eligible to receive any such benefit.

13.     Diane Lewis is a participant in the Plan under 29 U.S.C. §1002(7) because she is or may become eligible to receive a benefit under the Plan, or her beneficiaries may be eligible to receive any such benefit.

14. Marta Nelson is a participant in the Plan under 29 U.S.C. §1002(7) because she is or may become eligible to receive a benefit under the Plan, or her beneficiaries may be eligible to receive any such benefit.

15. Simone Adams is a participant in the Plan under 29 U.S.C. §1002(7) because she is or may become eligible to receive a benefit under the Plan, or her beneficiaries may be eligible to receive any such benefit.

16. Kasandra Adams is a participant in the Plan under 29 U.S.C. §1002(7) because she is or may become eligible to receive a benefit under the Plan, or her beneficiaries may be eligible to receive any such benefit.

17. Brian Adams is a participant in the Plan under 29 U.S.C. §1002(7) because he is or may become eligible to receive a benefit under the Plan, or his beneficiaries may be eligible to receive any such benefit.

## Defendant

18. Philips is a for-profit domestic corporation organized under Delaware law with its principal place of business in Andover, Massachusetts. Philips is a wholly owned subsidiary of Philips Holding USA, Inc. Philips Holding USA, Inc. is a wholly owned subsidiary of Koninklijke Philips Electronics N.V. Philips is the Plan Sponsor and Plan Administrator under 29 U.S.C. §1002(16)(A)(i) and (B)(i). See Section 1.35 of the Plan.

19. Philips, as the Plan Administrator, and acting through the Supervisory Board of Directors of Koninklijke Philips N.V. ("Board") under Sections 1.8 and 14.1 of the Plan, appoints an ERISA Administration Committee and an ERISA Investment Committee.

20.     Under Section 14.2(a)(1) of the Plan, the ERISA Administration Committee is a named fiduciary with the authority to control and manage the operation and administration of the Plan. This authority includes the powers necessary to enable it to properly to carry out such responsibilities, including but not limited to, the selection and compensation of the providers of administrative services to the Plan.

21.     Under Section 14.2(a)(2) of the Plan, the ERISA Investment Committee is a named fiduciary with respect to the control and management of the assets of the Plan. This authority includes the power to select, monitor, and remove the investment options made available to participants for the investment of their contributions and provision of their retirement income.

22.     In addition, the Investment Committee is responsible for establishing and maintaining the Investment Policy Statement ("IPS") for the Plan, which provides, among other things, a periodic review of the fund line up and the criteria for selecting, monitoring, and removing Plan investment options. Investment option selection and retention criteria includes, among other things, the investment returns and the management fees and administrative expenses of the fund. As required by the IPS, Philips, through its Pension Finance Department, was and is required to assist the Investment Committee in the monitoring of these funds.

23.     The duties and responsibilities of Philips under the Plan that have not been delegated are carried out by its directors, officers and employees, acting on behalf of and in the name of Philips and not as individual fiduciaries.

24.     The Committees and their members acted as alleged herein as the agents of Philips, or its co-fiduciaries.

## FACTS APPLICABLE TO ALL COUNTS

### Plan Investments

25.     In a defined-contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan, less expenses. See 29 U.S.C. §1002(34). Accordingly, poor investment performance and unreasonable fees can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. See, e.g., U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013)(illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).[3]

26.     Defendant controlled the investment options in which the participants could invest their retirement assets.

27.     As of December 31, 2014, Defendant provided 11 Vanguard mutual funds, Vanguard collective trust target date funds, and three non-Vanguard mutual funds.

---

[3] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

| Investment Options[4] | 2014 |
|---|---|
| DFA Emerging Markets Core Equity Fund-Instl | $ 11,960,327 |
| Fidelity Growth Company Fund | $ 275,002,006 |
| Principal Diversified Real Asset Fund-Instl | $ 25,898,310 |
| Vanguard Institutional Index Fund-Instl Plus | $ 608,370,183 |
| Vanguard Extended Market Index Fund-Instl Plus | $ 221,755,727 |
| Vanguard PRIMECAP Fund-Adm | $ 199,828,300 |
| Vanguard Prime Money Market Fund-Adm | $ 271,749,829 |
| Vanguard Small-Cap Growth Index Fund-Instl | $ 114,213,694 |
| Vanguard Small-Cap Value Index Fund-Instl | $ 119,621,572 |
| Vanguard Total Bond Market Index Fund-Instl Plus | $ 351,035,011 |
| Vanguard Total International Stock Index Fund-Instl Plus | $ 179,154,319 |
| Vanguard Windsor II Fund-Adm | $ 158,751,848 |
| Vanguard Target Retirement 2010 Trust Plus | $ 35,659,313 |
| Vanguard Target Retirement 2015 Trust Plus | $ 122,093,872 |
| Vanguard Target Retirement 2020 Trust Plus | $ 218,224,586 |
| Vanguard Target Retirement 2025 Trust Plus | $ 245,159,446 |
| Vanguard Target Retirement 2030 Trust Plus | $ 192,765,295 |
| Vanguard Target Retirement 2035 Trust Plus | $ 162,205,030 |
| Vanguard Target Retirement 2040 Trust Plus | $ 112,633,087 |
| Vanguard Target Retirement 2045 Trust Plus | $ 77,362,390 |
| Vanguard Target Retirement 2050 Trust Plus | $ 36,993,050 |
| Vanguard Target Retirement 2055 Trust Plus | $ 7,648,383 |
| Vanguard Target Retirement 2060 Trust Plus | $ 1,871,466 |
| Vanguard Target Retirement Income Trust Plus | $ 33,481,203 |

## I. The imprudent money market mutual fund.

28.    Stable value funds are a common investment in large defined

contribution plans and in fact are designed specifically for use in such plans as a

conservative, capital preservation investment. Stable value funds are conservatively

managed to preserve principal and accumulated interest, yet provide a significant

---

[4] "Instl" refers to the institutional share class, "Instl Plus" refers to the institutional plus share class, and "Adm" refers to the admiral share class.

interest rate. "Because they hold longer-duration instruments, [stable value funds] generally outperform money market funds, which invest exclusively in short-term securities." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); see also Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market*, 39 AKRON L. REV. 9, 24 (2006)(in contrast to money market funds, stable value funds "can invest in longer-term financial instruments", and thus, "Stable Value Funds simply outperform Money Market Funds").

29.     Stable value funds are limited to retirement plans with longer investment horizons and much less trading activity than retail investors. Money market mutual funds are open to all investors, including predominantly short-term investors with very short investment horizons and high frequency trading activity. Consequently, stable value funds can utilize longer duration investments to provide greater returns than money market mutual funds, yet with the same guaranty of principal and accumulated interest and liquidity. Stable value funds also provide guaranteed interest rates over fixed periods (usually six months), whereas money market mutual funds provide no guaranteed interest rate. Stable value funds guaranty principal and accumulated interest plus the promised future interest through wrap contracts issued by banks, insurance companies or other financial institutions.

30.     Even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of

return[.]" Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009).[5] The same was not true of many money market mutual funds, which declined in value below $1 and yielded no interest.

31.     Over 80% of plan sponsors offer a stable value fund. MetLife, *2015 Stable Value Study: A Survey of Plan Sponsors, Stable Value Fund Providers and Advisors* at 5 (2015).[6] Stable value returns were "*more than double*" the returns of money market funds from 1988 to 2015.  *Id.* at 7 (emphasis added). Stable value returns "have outperformed money market returns over the last 25 years." *Id.*

32.     Unlike the vast majority of 401(k) plans, Defendant provided the microscopically low-yielding Vanguard Prime Money Market Fund, rather than a stable value fund that would have provided superior returns while preserving capital and liquidity without any greater increase in risk compared to money market investments.

33.     Since February 2010 (if not earlier), Defendant has provided Plan participants as their sole capital-preservation, conservative investment option the Vanguard Prime Money Market Fund, initially in the higher-cost Investor class and as of October 1, 2013 in the lower-cost Institutional class. During that time, the Vanguard Prime Money Market Fund provided an annual return that was 0.33% at

[5] Available at http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf.

[6] Available at https://www.metlife.com/assets/cao/institutional-retirement/plan-sponsor/stable-value/Stable-Value-Vs-Money-Market/2015_StableValueStudyWebFinal.pdf.

its highest and 0.02% at its lowest. That microscopically small return did not even beat the rate of inflation during that time period.

34.     Hueler Analytics is the industry standard for reporting returns of stable value funds in an index called The Hueler Analytics Pooled Fund Comparative Universe ("Hueler Index"). Hueler data represents a reasonable estimate of the returns of a typical stable value fund that was available to the Plan. The returns of the funds in the Hueler Index have far exceeded the returns of the Vanguard Prime Money Market Fund in the Plan, as shown below:[7]

---

[7] Money market investment returns were obtained from Morningstar. For the Vanguard money market fund from 2010 to 2012, VMMXX investment returns were used. For 2013 to 2015, VMRXX investment returns were used.



**Money Market Fund vs. Stable Value Index**
**2010 to 6/30/2017**

Vanguard Prime Money Market Fund / Hueler Index

| Year | Vanguard Prime Money Market Fund | Hueler Index |
|------|----------------------------------|--------------|
| 2010 | 0.06% | 3.12% |
| 2011 | 0.04% | 2.69% |
| 2012 | 0.04% | 2.26% |
| 2013 | 0.02% | 1.84% |
| 2014 | 0.05% | 1.69% |
| 2015 | 0.11% | 1.76% |
| 2016 | 0.30% | 1.79% |
| 2Q2017 | 0.33% | 0.93% |

35. Hueler Index returns over the preceding 10, 15 and 20 years reflect similar disparities between money market mutual funds and stable value investments.

36. In light of stable value funds' clear advantages and enhanced returns compared to other fixed income options, when deciding which fixed income investment option to include in a defined contribution plan, a prudent fiduciary would consider using a stable value fund. Defendant imprudently and disloyally failed to provide a stable value fund for the Plan. Defendant failed to adequately consider a stable value fund after selecting Vanguard as the Plan's recordkeeper

and offering Vanguard investments, or come to a reasoned decision by weighing the benefits of a stable value fund compared to a money market fund.

37.    By providing participants the Vanguard Prime Money Market Fund instead of a stable value fund, as represented by the Hueler Index, Defendant caused the Plan and Philips employees and retirees to lose over $41 million in retirement savings from February 2010 through June 30, 2017. Participants continue to suffer such losses to the present because Defendant continues to provide a Vanguard Money Market Fund instead of a stable value fund.[8]

## II.  Unreasonable investment management fees from excessively high-priced investment options.

38.    Academic and financial industry literature shows the importance of low fees in selecting investments. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2009); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

---

[8] Plan losses have been brought forward to present value using the investment returns of the Hueler Index to compensate participants who have not been reimbursed for their losses.

[T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

39. Even if an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

40. To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000).

41. Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds without a documented process to realistically conclude that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses.

42. Moreover, the Plan's IPS required Defendant to consider the "aggregate assets in the [investment fund], including the assets of any pooled investment vehicle and separate account managed similarly by the managing investment company" for diversification and facilitating "economies of scale in administrative expenses and transaction costs."

43. Rather than taking advantage of the Plan's economies of scale, as required by the IPS, to reduce the investment expenses charged to Plan participants, Defendant selected and maintained high-priced share classes of mutual funds, instead of *identical* lower-cost share classes of those same mutual funds which were readily available to the Plan. Defendant also failed to adequately investigate and offer non-mutual fund alternatives, such as collective trusts and separately managed accounts, to further reduce the investment expenses charged to Plan participants. Holders of large pools of assets know that these investment vehicles are readily available to them and can be used for the same investment style and with the same portfolio manager, but are much less expensive. Each mutual fund in the Plan charged fees far in excess of the rates Defendant could have obtained for the Plan by using these comparable products.

### A. **Excessive fees compared to lower-cost share classes** of **the Plan's identical mutual fund options.**

44.     It is a simple principle of investment management that the larger the size of an investor's available assets, the lower the investment management fees as a percentage of assets that the investor can obtain in the market. Thus, large retirement plans have substantial bargaining power to negotiate low fees for investment management services.

45.     Jumbo retirement plans, such as the Plan, have much more bargaining power to negotiate low fees for investment management services than even large plans.

46.     Lower-cost institutional share classes of mutual funds compared to high-priced retail shares are readily available to institutional investors, like the Plan, or even smaller asset holders, that meet minimum investment amounts for these share classes.

47.     From February 2010 until October 1, 2013, Defendant imprudently and disloyally provided participants the more expensive share class of the following Vanguard mutual funds, even though the identical investment was available to the Plan at a much lower cost:

| Plan Mutual Fund | Plan's Fee | Identical Lower-Cost Mutual Fund | Identical Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Vanguard Total Bond Market Index Fund (Inv) (VBMFX) | 22 bps | Vanguard Total Bond Market Index Fund (InstlPlus) (VBMPX) | 5 bps | 340% |

| Plan Mutual Fund | Plan's Fee | Identical Lower-Cost Mutual Fund | Identical Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Vanguard Extended Market Index Fund (Inv) (VEXMX) | 24 bps | Vanguard Extended Market Index Fund (InstlPlus) (VEMPX) | 6 bps | 300% |
| Vanguard Inflation Protection Securities Fund (Inv) (VIPSX) | 22 bps | Vanguard Inflation Protection Securities Fund (Instl) (VIPIX) | 7 bps | 214% |
| Vanguard Prime Money Market Fund (Inv) (VMMXX) | 23 bps | Vanguard Prime Money Market Fund (Instl) (VMRXX) | 9 bps | 156% |
| Vanguard PRIMECAP Fund (Inv) (VPMCX) | 45 bps | Vanguard PRIMECAP Fund (Adm) (VPMAX) | 36 bps | 125% |
| Vanguard Small-Cap Growth Index Fund (Inv) (VISGX) | 26 bps | Vanguard Small-Cap Growth Index Fund (Instl) (VSGIX) | 8 bps | 225% |
| Vanguard Small-Cap Value Index Fund (Inv) (VISVX) | 26 bps | Vanguard Small-Cap Value Index Fund (Instl) (VSIIX) | 8 bps | 225% |
| Vanguard Total International Stock Index Fund (Inv) (VGTSX) | 22 bps | Vanguard Total International Stock Index Fund (InstlPlus) (VTPSX) | 10 bps | 120% |
| Vanguard Windsor II Fund (Inv) (VWNFX) | 35 bps | Vanguard Windsor II Fund (Adm) (VWNAX) | 27 bps | 130% |
| Vanguard 500 Index (Inv) (VFINX) | 17 bps | Vanguard Institutional Index (InstlPlus) (VIIIX) | 2.5 bps | 580% |

48.     These lower-cost share classes of the identical mutual funds were available to the Plan many years before Defendant restructured the investment lineup in 2013. In fact, 8 of these options were available since the late 1990s or early 2000s.

| Identical Lower-Cost Mutual Fund Option | Inception Date |
|---|---|
| Vanguard Extended Market Index Fund-Instl Plus | 1/13/2011 |
| Vanguard Inflation-Protected Securities Fund-Instl | 12/11/2003 |
| Vanguard Prime Money Market Fund-Instl | 10/2/1989 |
| Vanguard PRIMECAP Fund-Adm | 11/11/2001 |
| Vanguard Small-Cap Growth Index Fund-Instl | 5/23/2000 |
| Vanguard Small-Cap Value Index Fund-Instl | 12/6/1999 |
| Vanguard Total Bond Market Index Fund-Instl Plus | 9/17/1995 |
| Vanguard Total International Stock Index Fund-Instl Plus | 11/29/2010 |
| Vanguard Windsor II Fund-Adm | 5/13/2001 |
| Vanguard Institutional Index-Instl Plus | 7/6/1997 |

49.     Defendant similarly provided more expensive shares of the Fidelity Growth Company Fund. From February 2010 to the present, Defendant provided the retail share class of the Fidelity Growth Company Fund (FDGRX) as a Plan investment option. As of May 9, 2008, Fidelity provided the exact same investment in the K class shares (FGCKX), which charged 69–77 bps in annual fees, compared to 82–90 bps in annual fees for the retail class shares, which were the shares in the Plan. Even though Defendant switched to the cheaper share class of the Plan's Vanguard mutual funds on October 1, 2013, inexplicably, and to the Plan's detriment, it failed to do the same with the Fidelity Growth Company Fund when cheaper share classes were available to the Plan.

50.     Plan participants thus paid far higher fees than they should have, which resulted in receiving lower returns on their retirement investments, and fewer retirement assets to build for the future, than they would have obtained had Defendant performed its fiduciary duties.

51.     Because Defendant imprudently and disloyally provided participants the much more expensive versions of the Plan's same mutual fund options during these dates, Plan participants lost over $12 million of their retirement savings through unnecessary expenses.[9]

**B. *Excessive fees compared to separate accounts.***

52.     Large retirement plans, including those with assets over $500 million, can hire investment advisers directly to manage separate accounts tailored for the plan within plan-specific investment parameters and separately negotiated, low fees and even using the same investment managers as mutual funds with the same investment style. The same advisers who manage the investments of mutual funds also manage investments in a plan's separate account. Use of such accounts greatly reduces the cost of investing with the same adviser than through a mutual fund.

53.     According to the United States Department of Labor, separate accounts, which require a minimum investment of $15 million to $25 million per account, can "commonly" reduce "[t]otal investment management expenses" to "*one-*

---

[9] Plan losses have been brought forward to the present value using the investment returns of the S&P 500 Index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in Plan investments growing with the market.

*fourth of the expenses incurred through retail mutual funds*." U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, §2.4.1.3 (Apr. 13, 1998)(emphasis added).[10]

54.     The Plan had assets of well over $1 billion at all relevant times, and over *$3 billion* as of December 31, 2014. Thus, the Plan had ample assets to enable Defendant to provide separate account alternatives to the Plan's mutual funds.

55.     Separate accounts have numerous advantages over mutual funds in a 401(k) plan, including the ability to negotiate lower fees and avoid marketing fees built into retail mutual funds, control by the fiduciaries over investment guidelines, and ability to avoid holding significant cash for shareholder redemptions that occur much more frequently in retail mutual funds than in retirement accounts.[11] In a mutual fund, all investors are charged the same fee, and investors have no ability to modify the fund's investment guidelines, which are set by the fund's investment adviser. In a separate account, the plan sponsor can negotiate the best possible fee for the plan using its bargaining power, and can tailor the investment guidelines to fit the demographics of the participants.

56.     From February 2010 to the present, Defendant provided participants the Fidelity Growth Company Fund, retail share class (FDGRX), which charged annual fees of 82–90 bps. The Plan invested $158–$275 million in that fund. A prudent and loyal fiduciary could have negotiated an even lower management fee

_____

[10] On the Department of Labor website: http://www.dol.gov/ebsa/pdf/401krept.pdf.
[11] Unlike mutual fund shareholders, 401(k) participants rarely make trades in their account. Olivia Mitchell, Gary Mottola, Stephen Utkus, and Takeski Yamaguchi, *The Inattentive Participant: Portfolio Trading Behaviors in 401(k) Plans*, at 17–18 (June 2006), available at http://www.mrrc.isr.umich.edu/publications/Papers/pdf/wp115.pdf.

given the Plan's total assets invested in the fund, which could have been as low as 21 bps, based on expenses one-fourth the cost of the retail shares.

57.    Since 2014, Defendant provided participants the Principal Diversified Real Asset Fund, Institutional share class (PDRDX), as a Plan investment option. The institutional shares charged annual fees of 86–87 bps. The Plan invested over $25 million in that fund. Based on published rates alone before negotiation for lower rates readily available for plans the size of the Philips Plan, the Plan could have had one of the same advisers manage the same fund in a separate account for the Plan at a cost of 20 bps given the Plan's total assets and assets invested in this fund.

58.    Had Defendant provided separate accounts for the Plan's investments instead of mutual funds, Plan participants would not have lost millions of dollars in their retirement savings due to unreasonable expenses throughout the relevant time period.

## C. *Excessive fees compared to collective trusts.*

59.    Collective trusts also provide much lower investment management fees than the Plan's mutual funds, and in some instances, separate accounts. Collective trusts are a common investment vehicle in large 401(k) plans, and are accessible even to midsize plans with $100 million or more in total plan assets.

60.    Vanguard offers low-cost collective trust funds to qualified retirement plans in several asset styles, including large cap domestic equities, small cap equities, international equities, and target date funds.

61.     For an investment in the S&P 500® index, for example, Vanguard offers the collective trust Vanguard Employee Benefit Index, which is comparable to the Vanguard Institutional Index mutual fund in the Plan as of October 2013.[12] Depending on the fee negotiations between the plan fiduciary and Vanguard and the amount of assets for the mandate, the collective trust version has lower fees and hence better performance than the mutual fund equivalent. This collective trust alternative has been available since September 30, 1985.

62.     Prior to October 1, 2013, the Plan invested in the higher-cost mutual fund version of the Vanguard Target Retirement Funds, even though much lower-cost collective trust Vanguard target date funds were available to the Plan. The lower-cost collective trust alternatives to the Plan's target date mutual fund options included the following:

| Plan's Vanguard Mutual Fund Target Date Funds | Plan's Vanguard Mutual Fund Fee | Vanguard Collective Trust Fund Fee | Plan's Excess |
|---|---|---|---|
| Vanguard Target Retirement 2010 (VTENX) | 17 bps | 8 bps | 113% |
| Vanguard Target Retirement 2015 (VTXVX) | 17 bps | 8 bps | 113% |
| Vanguard Target Retirement 2020 (VTWNX) | 17 bps | 8 bps | 113% |
| Vanguard Target Retirement 2025 (VTTVX) | 18 bps | 8 bps | 125% |
| Vanguard Target Retirement 2030 (VTHRX) | 18 bps | 8 bps | 125% |
| Vanguard Target Retirement 2035 (VTTHX) | 19 bps | 8 bps | 138% |

---

[12] From February 2010 to October 1, 2013, the Plan invested in the Vanguard 500 Index fund.

| Plan's Vanguard Mutual Fund Target Date Funds | Plan's Vanguard Mutual Fund Fee | Vanguard Collective Trust Fund Fee | Plan's Excess |
|---|---|---|---|
| Vanguard Target Retirement 2040 (VFORX) | 19 bps | 8 bps | 138% |
| Vanguard Target Retirement 2045 (VTIVX) | 19 bps | 8 bps | 138% |
| Vanguard Target Retirement 2050 (VFIFX) | 19 bps | 8 bps | 138% |
| Vanguard Target Retirement 2055 (VFFVX) | 19 bps | 8 bps | 138% |
| Vanguard Target Retirement 2060 (VTTSX) | 18 bps | 8 bps | 125% |
| Vanguard Target Retirement Income (VTINX) | 17 bps | 8 bps | 113% |

63.     The Vanguard lower-cost collective trust funds were available to the Plan well before Defendant restructured the investment lineup in 2013. In fact, 10 of the 12 target date funds were available in 2007.[13]

| Vanguard Target Date Collective Trust Fund | Inception Date |
|---|---|
| Vanguard Target Retirement Trust 2010 | 6/21/2007 |
| Vanguard Target Retirement Trust 2015 | 6/27/2007 |
| Vanguard Target Retirement Trust 2020 | 6/21/2007 |
| Vanguard Target Retirement Trust 2025 | 6/27/2007 |
| Vanguard Target Retirement Trust 2030 | 6/27/2007 |
| Vanguard Target Retirement Trust 2035 | 6/28/2007 |
| Vanguard Target Retirement Trust 2040 | 6/29/2007 |
| Vanguard Target Retirement Trust 2045 | 6/30/2007 |

---

[13] Collective trust information provided on Vanguard's website for institutional investors, available at https://institutional.vanguard.com/.

| Vanguard Target Date Collective Trust Fund | Inception Date |
|---|---|
| Vanguard Target Retirement Trust 2050 | 6/27/2007 |
| Vanguard Target Retirement Trust 2055 | 10/4/2010 |
| Vanguard Target Retirement Trust 2060 | 2/29/2012 |
| Vanguard Target Retirement Income Trust | 6/21/2007 |

64.     As of October 1, 2013, Defendant included Vanguard target date funds known as the Target Retirement Trust I Funds. However, Defendant could have obtained lower-cost versions of these same collective trusts in the Retirement Trust Plus series, which, available on August 4, 2011, charged 25% less in annual fees than the Retirement Trust I Funds (6 bps vs. 8 bps). Inexplicably, however, Defendant did not begin providing the Trust Plus Funds until 2015.

65.     From February 2010 to the present, Defendant provided the Fidelity Growth Company Fund as a Plan investment option. Fidelity offers a lower-cost collective trust version of the fund at 43 bps, *less than half* the fee currently paid by Plan participants. However, Defendant imprudently and disloyally failed to consider and provide the lower-cost collective trust version to Plan participants to their detriment.

66.     By providing participants more expensive versions of the same Vanguard target date investments and the S&P 500® index fund, Defendant caused participants to lose millions of dollars in their retirement savings due to unreasonable expenses.

### III. Excessive administrative fees.

67.     The Vanguard Group, Inc. is the Plan's recordkeeper under an agreement with Philips. Vanguard Fiduciary Trust Company is the Plan trustee under an agreement with Philips Electronics.  The Vanguard entities are hereafter collectively referred to as "Vanguard." This arrangement has been in place since 1995 or before and Vanguard has served in these roles throughout the time in suit.

68.     Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are capable of providing a high level of service to a jumbo defined contribution plan, like the Plan, and will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based on price, and vigorously compete for business by offering the best price. The cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. Plans with large numbers of participants can take advantage of economies of scale: a plan with 50,000 participants can negotiate a much lower per participant fee for recordkeeping services than a plan with 1,000 participants.

69.     Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount per participant in the plan rather than as a percentage of plan assets. Otherwise, as plan assets increase, such as through participant

contributions or investment gains, the recordkeeping compensation increases without any change in the recordkeeping and administrative services, leading to excessive fees.

70.     Mutual funds have thousands of shareholders and the expense ratio for those funds includes within it a portion for recordkeeping those thousands of shareholders' accounts. However, since a 401(k) plan invests in a mutual fund as a single investor, the mutual fund has only one account to recordkeep. The plan recordkeeper tracks the account of each plan participant. In these circumstances, some mutual funds engage in a practice known as revenue sharing.

71.     In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the annual expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's recordkeeper putatively for providing recordkeeping and administrative services for the mutual fund. Because revenue sharing arrangements provide asset-based fees, prudent fiduciaries must monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, flat, per-participant recordkeeping fee that can be obtained from the recordkeeping market through competitive bids. Because revenue sharing payments are asset based, they can provide excessive compensation as investment assets increase (such as through participant contributions or investment gains) without any change in recordkeeping services.

72.     To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years, and monitor recordkeeping costs regularly within that period.

73.     In order to make an informed assessment as to whether a recordkeeper is receiving no more than reasonable compensation for the services provided to a plan, the responsible fiduciary must identify *all* fees, including recordkeeping fees and other sources of compensation, paid to the service provider.

74.     The Plan's recordkeeping fees were excessive in part because Defendant failed to monitor and control the amount of asset-based revenue sharing fees Vanguard received.

75.     From February 2010 through 2015, Defendant caused the Plan to compensate Vanguard for its recordkeeping services with hard dollar and asset-based revenue sharing of the annual expenses of the Plan's investment options instead of a fixed recordkeeping fee. These asset-based fees increased each year as Plan assets grew from $2.5 billion to almost $4 billion even though recordkeeping services did not significantly change in that time.

76.     Based on information currently available to Plaintiffs regarding the Plan's features, the nature of the administrative services provided by Vanguard, the Plan's participant level (roughly 30,000), and the recordkeeping market, the outside

limit of a reasonable recordkeeping fee for the Plan would have been $30 per participant.

77.     Defendant could have and should have capped the amount of revenue sharing to ensure that excessive amounts were returned to the Plan but failed to do so and the Plan therefore paid millions of dollars in excessive recordkeeping fees from February 2010 through 2015.

78.     Upon information and belief, Defendant also failed to conduct a competitive bidding process for the Plan's recordkeeping services at any time since February 2010. Indeed, upon information and belief, the relationship between Vanguard and Philips extends back to 1995 and since that time, Philips has never engaged in a competitive bidding process for these services.

79.     A competitive bidding process for the Plan's recordkeeping services would have produced a reasonable recordkeeping fee for the Plan long ago. By failing to engage in a competitive bidding process for Plan recordkeeping fees, Defendant caused the Plan to pay excessive recordkeeping fees. If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. See *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, "us[ing] revenue sharing to benefit [the plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and control recordkeeping fees" and "paying excessive revenue sharing" is a breach of fiduciary duties. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

80.     Defendant failed to prudently monitor and control Vanguard's recordkeeping compensation to ensure that only reasonable fees were paid for recordkeeping and administrative services.

81.     Had Defendant ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost millions of dollars in their retirement savings through unreasonable recordkeeping and administrative fees.

### IV. Imprudent selection and retention of the Principal Diversified Real Asset Fund.

82.     Starting on August 29, 2014, Defendant provided the actively managed Principal Diversified Real Asset Fund (Instl) (PDRDX) as a Plan investment option.

83.     The IPS requires that each investment option's objective be evaluated and the investment returns reviewed. In particular, for each actively managed fund, the fund "is expected to rank in the top 50% of Peers and to outperform the Benchmark" for "[over] a market cycle and on a 'since inception' basis." In addition, each fund, on a risk-adjusted basis, "is expected to exceed the risk-adjusted return of the Benchmark."

84.     Per the IPS, Defendant is required to periodically evaluate each fund to determine if the fund meets the above-referenced objective and returns.

85.     Despite underperforming its benchmark, other style-specific investments, and consistently ranking at the bottom of its peer group, Defendant selected and retained the Principal Diversified Real Asset Fund as a Plan investment option.

86.     When Defendant first provided the Principal Diversified Real Asset Fund as a Plan investment option in August 2014, the fund had less than a five-year performance history, with an inception date of March 16, 2010. Defendant therefore had no long-term performance history by which to evaluate the fund compared to its benchmark and other style-specific investments to ensure the investment selection was solely in the interest of Plan participants.

87.     Prior to inclusion in the Plan, the fund also consistently ranked at or near the bottom decile of its Morningstar peer group. From 2012 to 2014, the Principal Diversified Real Asset Fund not only was not ranked in the top 50% of peers as required by the IPS, but was ranked annually in the 93rd, 71st, and 82nd percentiles, respectively. These abysmal peer group rankings did not end after Defendant provided this fund to Plan participants in 2014. Rather, for 2015, the fund ranked in the *98th* percentile, again clearly in violation of the IPS mandating a peer group ranking in the top 50% for actively managed funds. Moreover, as of December 31, 2015, the fund's five-year category ranking was in the *96th* percentile.

88.     These peer group rankings are in stark contrast to those of the Vanguard Inflation Protection Securities Fund (Instl) (VIPIX), which was removed from the Plan and replaced by the Principal Diversified Real Asset Fund in August 2014. From 2012 to 2015, the fund ranked annually in the 24th, 52th, 5th, and 31st, percentiles, respectively. For the five-year period ending December 31, 2015, the fund ranked in the *3rd* percentile.

89.    Since August 2014, the Principal Diversified Real Asset Fund has

significantly underperformed its benchmark, the Barclays U.S. Treasury Inflation

Protected Securities (TIPS) Index, and institutional alternatives in a similar

investment style that were available to the Plan, including the previously offered

Vanguard Inflation Protection Securities Fund. In particular, for 2015 alone, the

Principal fund underperformed its benchmark and the Vanguard alternative by

over *10 percentage points – 1000 basis points*.

90.    As graphically shown below, the Vanguard Inflation Securities Fund,

with an expense ratio of 7 bps, charged dramatically lower fees than the Principal

Diversified Real Asset Fund, which charged participants as much as 87 bps, or *up to*

*1143% more* than the better-performing lower-cost alternative:



91.    Prudent fiduciaries of defined contribution plans, including those who

adopt an IPS for the selection of investments with criteria similar to the Plan's IPS,

would not have selected the Principal Diversified Real Asset Fund. Further, despite

the fund monitoring criteria set forth in the IPS, and prudent conduct of other fiduciaries, Defendant failed to remove the Principal Diversified Real Asset Fund despite its repeated underperformance compared to its benchmark, peer group, and lower-cost alternatives.

92.    Had the amounts invested in the Principal Diversified Real Asset Fund instead been invested in a prudent alternative from August 29, 2014 through June 30, 2017, such as the Vanguard Inflation Protection Securities Fund, the Plan would not have lost over $2.3 million in participants' retirement savings. Plan participants continue to suffer losses to the present because Defendant continues to provide the Principal Diversified Real Asset Fund as a Plan investment option.

## ERISA'S FIDUCIARY STANDARDS

93.    ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendant as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>   (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and]
>   (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

94.    Under 29 U.S.C. 1103(c)(1), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be

held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

95.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

96.     ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants. *Bierwirth*, 680 F.2d at 271, 272 n.8.

97.     As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

98.     An investment policy statement or IPS is a governing plan document within the meaning of 29 U.S.C. §1104(a)(1)(D). See 29 C.F.R. § 2509.94-2 (1994), replaced by 29 C.F.R. §2509.08-2(2) (2008)( "Statements of investment policy issued by a named fiduciary authorized to appoint investment managers would be part of the 'documents and instruments governing the plan' within the meaning of ERISA Sec. 404(a)(1)(D)."). "Fiduciaries who are responsible for plan investments governed by ERISA must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1042 (9th Cir. 2001). "[F]ailure to follow written statements of investment policy constitutes a breach of fiduciary duty." *Id.* (*citing Dardaganis v. Grace Capital, Inc.*,

889 F.2d 1237, 1241–42 (2d Cir. 1989)). A violation of investment guidelines is an independent breach of fiduciary duty, regardless of whether the action was otherwise prudent. See 29 U.S.C. §1104(a)(1)(D).

99.     ERISA also imposes explicit co-fiduciary liability on plan fiduciaries. 29 U.S.C. §1105(a) provides for fiduciary liability for a co-fiduciary's breach:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
> (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

100.    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

101.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

102.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §§1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All persons who participated in the Plan at any time during the Class Period, including any Beneficiary of a deceased person who participated in the Plan at any time during the Class Period, and/or Alternate Payee, in the case of a person subject to a Qualified Domestic Relations Order who participated in the Plan at any time during the Class Period.

103.    This action meets the requirements of Federal Rule of Civil Procedure 23 and is certifiable as a class action for the following reasons:

a.    The Class includes over 30,000 members and is so large that joinder of all its members is impracticable.

b.    There are questions of law and fact common to this Class because Defendant owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries

liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendant's breach of duty.

c.     Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendant's misconduct.

d.     Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant in respect to the discharge of its fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or

impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

104.  A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

105.  Plaintiffs' counsel, Schlichter, Bogard & Denton, LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.  Schlichter, Bogard & Denton has been appointed as class counsel in 15 other ERISA class actions regarding excessive fees in large defined contribution plans. As a district court in one of those cases recently observed: "the firm of Schlichter, Bogard & Denton ha[s] demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015

U.S.Dist.LEXIS 93206 at 4–5 (S.D. Ill. July 17, 2015). Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" of 401(k) fee litigation "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012). "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D. Ill. Oct. 15, 2013). In another 401(k) fee case, the District Court stated: "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at 8 (S.D.Ill. Jan. 31, 2014).

      b.      The U.S. District Court Judge G. Patrick Murphy recognized the work of Schlichter Bogard & Denton as exceptional:

> Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work…, investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans.

*Will v. General Dynamics*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at 8–9

(S.D.Ill. Nov. 22, 2010).

      c.      Schlichter, Bogard & Denton handled the only full trial of an

ERISA excessive fee case, resulting in a $36.9 million judgment for the

plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB,*

*Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the

district court concluded that "Plaintiffs' attorneys are clearly experts in

ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS

157428 at 10 (W.D.Mo. Nov. 2, 2012). Following remand, the district court

again awarded Plaintiffs' attorney's fees emphasizing the significant

contribution Plaintiffs' attorneys have made to ERISA litigation, including

educating the Department of Labor and courts about the importance of

monitoring fees in 401(k) plans.

> Of special importance is the significant, national contribution made
> by the Plaintiffs whose litigation clarified ERISA standards in the
> context of investment fees. The litigation educated plan
> administrators, the Department of Labor, the courts and retirement
> plan participants about the importance of monitoring recordkeeping
> fees and separating a fiduciary's corporate interest from its
> fiduciary obligations.

*Tussey v. ABB, Inc.,* 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D.Mo. Dec. 9,

2015).

      d.      Schlichter, Bogard & Denton is also class counsel in *Tibble v.*

*Edison Int'l*, 135 S. Ct. 1823, 1829 (2015), in which the Supreme Court held

in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty

to monitor investments and remove imprudent ones[.]" Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will have a broad effect on defined contribution plans.

      e.      The firm's work in ERISA excessive fee class actions has been covered by the New York Times and Wall Street Journal, among other media outlets. See, e.g., Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[14] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[15] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014);[16] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015);[17] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[18] Darla Mercado, *Public Enemy No. 1 to 401(k) Profiteers*, INVESTMENTNEWS (Jan. 26, 2014).[19]

---

[14] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[15] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[16] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[17] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[18] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[19] Available at http://www.investmentnews.com/article/20140126/REG/301269992/public-enemy-no-1-for-401-k-profiteers.

## COUNT I

### Breach of Duties of Loyalty and Prudence, and Violation of IPS— Vanguard Prime Money Market Mutual Fund

106.    Plaintiffs restate and incorporate the allegations of the preceding paragraphs.

107.    Defendant breached its duties under 29 U.S.C. §§1104(a)(1)(A) & (B) and the provisions of the IPS in violation of 29 U.S.C. §1104(a)(1)(D) by providing participants the Vanguard Prime Money Market Fund instead of a stable value fund, which would have provided participants the same low-risk investment with guaranty of principal and accumulated interest but a higher and more stable rate of interest. Defendant failed to consider a stable value fund as a replacement for the Vanguard Prime Money Market Fund and failed to come to a reasoned decision for providing the Vanguard Prime Money Market Fund instead of a stable value fund, and consequently failed to remove that imprudent fund from the Plan.

108.    Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

## COUNT II

### Breach of Duties of Loyalty and Prudence, and Violation of the IPS— Unreasonable Investment Management Fees

109.    Plaintiffs restate and incorporate the allegations of the preceding paragraphs.

110.    Defendant breached its duties under 29 U.S.C. §§1104(a)(1)(A) & (B) and the terms of the IPS in violation of 29 U.S.C. §1104(a)(1)(D) by providing Plan investment options that charged unreasonable annual expenses in light of the lower-cost versions of the same investments and alternative funds that were available to the Plan.

111.    Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

## COUNT III

### Breach of Duties of Loyalty and Prudence— Excessive Administrative Fees

112.    Plaintiffs restate and incorporate herein the allegations of the preceding paragraphs.

113.    Defendant caused the Plan to pay excessive administrative fees to Vanguard through uncapped and unmonitored revenue sharing from Plan investment options and by failing to put Plan administrative services out for

competitive bidding on a regular basis, at least every three years. Defendant therefore breached its duties under 29 U.S.C. §1104(a)(1)(A) and (B).

114.    Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

## COUNT IV

### Breach of Duties of Loyalty and Prudence, and Violation of IPS—the Principal Diversified Real Asset Fund

115.    Plaintiffs restate and incorporate the allegations of the preceding paragraphs.

116.    Defendant breached its duties under 29 U.S.C. §§1104(a)(1)(A) & (B) and the terms of the IPS in violation of 29 U.S.C. §1104(a)(1)(D) by providing as a Plan investment option the Principal Diversified Real Asset Fund. Rather than employing a prudent process for selecting and retaining the Principal Diversified Real Asset Fund, Defendant selected this fund for the Plan despite consistent and dramatic underperformance compared to its benchmark, peer group, and similar lower-cost investment alternatives that were readily available to the Plan.

117.    Further, a prudent and loyal fiduciary who engaged in a prudent process for monitoring plan investments and removing imprudent funds would have

concluded that the Principal Diversified Real Asset Fund was imprudent, not in the interest of the Plan would have been removed the fund.

118.    Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

**COUNT V**

**Failure to Monitor Fiduciaries**

119.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

120.    A fiduciary must ensure that co-fiduciaries and those to whom any responsibilities are delegated are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not doing so.

121.    Defendant, acting through the Board, appointed the ERISA Administration Committee and ERISA Investment Committee as the entities responsible for controlling and managing the operation and administration of the Plan, including investment functions. To the extent any of the Defendant's fiduciary responsibilities were delegated in whole or in part to another fiduciary, Defendant's

monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

122.   Defendant breached its fiduciary monitoring duties by, among other things:

a.     failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

b.      failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperforming Plan investments in violation of ERISA;

c.     failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments, a process to prevent the recordkeeper from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same, and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

d.      failing to ensure that the monitored fiduciaries considered the ready availability of comparable investment options to such a jumbo plan, including lower-cost share classes of the identical mutual funds, still lower cost separate accounts, and even lower cost collective trusts, that charged far lower fees than the Plan's mutual fund options; and

e.      failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive-cost investments, and an option that did not even keep up with inflation, all to the detriment of Plan participants' retirement savings.

123.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had Defendant discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, and the Plaintiffs and the other Class members, lost tens of millions of dollars in their retirement savings.

124.    Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

## DEMAND FOR JURY TRIAL

125.    Plaintiffs demand a trial by jury under Fed.R.Civ.P. 38 and the Constitution of the United States.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that the Defendant breached its fiduciary duties as described above;

- find and adjudge that Defendant is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order Defendant to provide all accountings necessary to determine the amounts Defendant must make good the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- reform the Plan to render it compliant with ERISA;

- surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton, LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

May 10, 2018

Respectfully submitted,

/s/ Jerome J. Schlichter
SCHLICHTER, BOGARD & DENTON, LLP
Jerome J. Schlichter
100 South Fourth Street, Ste. 1200
St. Louis, MO 63102
Phone: (314) 621-6115
Fax: (314) 621-5934
jschlichter@uselaws.com

*Attorneys for Plaintiffs*